http://www.va.gov/vetapp16/Files4/1630490.txt

Citation Nr: 1630490 
Decision Date: 07/29/16 Archive Date: 08/04/16

DOCKET NO. 08-37 028 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Houston, Texas

THE ISSUES

1. Entitlement to an initial rating in excess of 10 percent disabling for residuals of a cerebrovascular accident (CVA) (a residual stroke disability). 

2. Entitlement to an increased rating in excess of 30 percent disabling for ischemic heart disease, status post myocardial infarction (heart disability).

3. Entitlement to service connection for insomnia, claimed as secondary to residuals of a CVA. 

REPRESENTATION

Appellant represented by: Texas Veterans Commission

WITNESS AT HEARING ON APPEAL

The Veteran

ATTORNEY FOR THE BOARD

T. Susco, Associate Counsel

INTRODUCTION

The Veteran served on active duty from April 1973 to September 1993. 

This matter comes before the Board of Veterans' Appeals (Board) on appeal from November 2006 and January 2013 rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in Houston, Texas. 

In March 2014, the Veteran testified at a Travel Board hearing before the undersigned Veterans Law Judge. The undersigned noted the issues on appeal and engaged in a colloquy with the Veteran toward substantiation of the claims. See Bryant v. Shinseki, 23 Vet. App. 488, 496-97 (2010). A copy of the hearing transcript is associated with the claims file. 

In June 2014 and March 2015, the Board remanded the appeal to the RO for additional development. The matter has been properly returned to the Board for appellate consideration. See Stegall v. West, 11 Vet. App. 268 (1998). 

This appeal was processed using both the "Virtual VA" system and the "Veterans Benefits Management System" paperless claims processing system. Accordingly, any future review of the Veteran's case should consider the electronic record. 
 

FINDINGS OF FACT

1. The Veteran has a current disability manifested by insomnia. 

2. The Veteran's insomnia is proximately due to the service-connected residual stroke disability. 

3. For the entire initial rating period on appeal, the Veteran's residual stroke disability has been manifested by symptomatology more nearly approximating mild incomplete paralysis of the external popliteal nerve, but is not shown to have been manifested by symptomatology more nearly approximating moderate, or greater, incomplete paralysis or complete paralysis. 

4. For the entire initial rating period on appeal, the Veteran's heart disability has been manifested by diagnostic evidence of cardiac hypertrophy and a cardiac functional capacity of at least seven metabolic equivalents. A cardiac functional capacity of less than five metabolic equivalents, a left ventricular ejection fraction of less than 50 percent, and congestive heart failure have not been shown. 

CONCLUSIONS OF LAW

1. Resolving all reasonable doubt in favor of the Veteran, the criteria for service connection for insomnia as secondary to the service-connected residual stroke disability have been met. 38 U.S.C.A. §§ 1101, 1110, 1131, 1153(a), 5103A, 5107(b) (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.303, 3.310 (2015).

2. For the entire rating period on appeal, the criteria for an initial rating in excess of 10 percent disabling for a residual stroke disability have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.321, 4.1-4.7, 4.10, 4.124a, Diagnostic Code 8521 (2015). 

3. For the entire rating period on appeal, the criteria for an initial rating in excess of 30 percent disabling for a heart disability have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.321, 4.1-4.7, 4.10, 4.104, Diagnostic Code 7005 (2015). 

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duties to Notify and Assist

VA has satisfied its duties under the Veteran's Claims Assistance Act of 2000 (VCAA) to notify and assist. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.326(a) (2015).

Regarding the claim of service connection for insomnia, this claim has been considered with respect to VA's duties to notify and assist. Given the favorable outcome in this decision that represents a full grant of this issue, further explanation of how VA has fulfilled the duties to notify and assist with respect to this issue is not necessary. See Bernard v. Brown, 4 Vet. App. 384, 394 (1993).

As the appeal arises from the Veteran's disagreement with the initial disability ratings assigned following the grants of service connection for a residual stroke and heart disabilities, no additional notice is required. Once service connection is granted, the claim is substantiated, additional notice is not required, and any defect in notice is not prejudicial. 38 C.F.R. § 3.159(b)(3)(i); Hartman v. Nicholson, 483 F.3d 1311 (Fed. Cir. 2007); Dunlap v. Nicholson, 21 Vet. App. 112 (2007). 

With regard to the duty to assist, VA has made reasonable efforts to obtain relevant records and evidence. Specifically, the information and evidence that have been associated with the claims file include VA and private treatment records, VA examination reports from November 2006, March 2010, December 2010, March 2011, November 2011, August 2013, July 2014, and July 2015, and the Veteran's statements, including his testimony at the March 2014 Board hearing. 

During the appeal period, including during the March 2014 Board hearing, the Veteran identified relevant private medical records from Dr. Y. The record contains two pages of a February 2008 electrodiagnostic report completed by Dr. Y; however, complete medical records from Dr. Y. have not been obtained. In June 2013, the Veteran completed a VA Form 21-4142, Authorization and Consent to Release of Information, requesting that VA obtain medical records from Dr. Y.; however, no request for these records was made at that time. At the March 2014 Board hearing, the Veteran testified that he was attempting to acquire these medical records but was having difficulty as Dr. Y. had switched medical offices. 

In the June 2014 Remand, the Board directed the RO to obtain medical records from Dr. Y. Despite the Veteran's June 2013 signed release, the RO was unable to obtain medical records from Dr. Y. because the authorization signed by the Veteran automatically expired after 180 days. Therefore, in July 2014, the RO sent correspondence to the Veteran requesting that he submit any private medical records or complete a VA Form 21-4142 to allow VA to obtain any identified records; the Veteran did not submit any signed authorization forms. In the March 2015 Remand, the Board again directed the RO to obtain medical records from Dr. Y. In an April 2015 correspondence, the RO requested that the Veteran either submit any private medical records or complete a VA Form 21-4142 to allow VA to obtain any identified records; to date, the Veteran has not responded to the April 2015 correspondence. 

Regarding the medical records from Dr. Y., the Board finds that substantial compliance with the directives of the June 2014 and March 2015 Remands has been achieved. See Stegall, 11 Vet. App. 268; D'Aries v. Peake, 22 Vet. App. 97 (2008). While neither the July 2014 nor April 2015 correspondence specifically identified the need for a new authorization to obtain medical records from Dr. Y., both Board remands indicated that medical records from Dr. Y. were still outstanding and the RO attempted to obtain authorization from the Veteran in two separate correspondences. The "duty to assist is not always a one-way street" and a veteran is obliged to cooperate in the development of the pending claim. Wood v. Derwinski, 1 Vet. App. 190, 193 (1991). The RO made reasonable attempts to obtain new authorization for the release of medical records from Dr. Y.; therefore, the Board finds that substantial compliance has been achieved and will decide this matter based on the evidence of record as it is currently developed. 

The Veteran was afforded VA examinations in November 2006, March 2010, December 2010, March 2011, November 2011, August 2013, July 2014, and July 2015. When VA undertakes to provide an examination, it must ensure that the examination is adequate. Barr v. Nicholson, 21 Vet. App. 303, 312 (2007). The VA examinations are informed and adequate. The VA examiners reviewed the Veteran's medical history and current symptoms, made clinical observations, and rendered opinions regarding the severity of the disabilities. In addition, the VA examiner addressed all the relevant rating criteria for rating residual neurologic and cardiac disabilities, including the functional impact of the Veteran's disabilities upon his occupational and social functioning. 

VA has satisfied its duties to notify and assist and the Board may proceed with appellate review.

Service Connection Claims

Service connection may be granted for a disability resulting from a disease or injury incurred in or aggravated by active military, naval, or air service. 38 U.S.C.A. §§ 1110, 1131; 38 C.F.R. § 3.303(a). Service connection may also be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d). Establishing service connection generally requires (1) medical evidence of a current disability; (2) medical or, in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury; and (3) medical evidence of a nexus between the claimed in-service disease or injury and the present disability. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004). 

The Board has a duty to consider all theories of entitlement to the benefit sought. See Szemraj v. Principi, 357 F.3d 1370, 1371 (Fed. Cir. 2004); see also Schroeder v. West, 212 F.3d 1265 (Fed. Cir. 2000). Thus, the Board must consider both direct and secondary theories of entitlement with respect to the Veteran's claim of service connection. However, as the Board is granting service connection based on a secondary theory of entitlement, the additional theory of direct service connection is rendered moot because there remain no questions of law or fact as to the fully granted issue; therefore, the direct service connection theory will not be further discussed. See 38 U.S.C.A. § 7104. 

Service connection may be granted for a disability that is proximately due to, or the result of, a service-connected disability. See 38 C.F.R. § 3.310(a). To prevail on the issue of secondary service connection, the record must show (1) evidence of a current disability, (2) evidence of a service-connected disability, and (3) medical nexus evidence establishing a connection between the current disability and the service-connected disability. Wallin v. West, 11 Vet. App. 509, 512 (1998); Reiber v. Brown, 7 Vet. App. 513, 516-17 (1995).

In rendering a decision on appeal, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive, and provide the reasons for its rejection of any material favorable to the claimant. Gabrielson v. Brown, 7 Vet. App. 36, 39-40 (1994); Gilbert v. Derwinski, 1 Vet. App. 49, 57 (1990). Competency of evidence differs from weight and credibility. Competency is a legal concept determining whether testimony may be heard and considered by the trier of fact, while credibility is a factual determination going to the probative value of the evidence to be made after the evidence has been admitted. Rucker v. Brown, 10 Vet. App. 67, 74 (1997); Layno v. Brown, 6 Vet. App. 465, 469 (1994). 

When all the evidence is assembled, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with a veteran prevailing in either event, or whether a preponderance of the evidence is against a claim, in which case, the claim is denied. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102.

Insomnia

The Veteran contends that his insomnia is the direct result of his service-connected residuals stroke disability. In a November 2006 rating decision, service connection was granted for a residuals stroke disability. 

The Veteran has a current diagnosis of insomnia. Upon VA examination in July 2014, the Veteran identified a current symptom of insomnia. See also August 2013 VA Examination Report; March 2014 Hearing Transcript. The VA examiner, in a July 2015 addendum medical opinion, indicated that the Veteran experiences insomnia as a disability distinct from the service-connected neurologic residuals. The VA examiner indicated that the severity of the Veteran's insomnia was moderate. 

The evidence supports a finding that the Veteran's insomnia is proximately due to the residuals stroke disability. Following the July 2014 VA examination, the VA examiner was asked to opine on the nexus, if any, between the Veteran's stroke and his insomnia. In a May 2015 addendum opinion, the VA examiner opined that "based on [a] review of the [service treatment records], previous exam[inations] and [his] clinical experience, the Veteran's insomnia has no specific cause. Stating an etiology would be mere speculation." 

In a clarifying July 2015 addendum opinion, the VA examiner indicated that "insomnia is a possible symptom following a CVA" that could be separately evaluated. The VA examiner then opined that "based on [a] review of previous exam[inations], history, [electronic] folder review, the Veteran's insomnia is at least as likely as not due to his [service-connected] CVA." 

The VA examiner provided an opinion that weighs in favor of the Veteran's claim. The opinion provided by the VA examiner is competent and probative evidence. The VA examiner reviewed the claims file, interviewed the Veteran, performed an appropriate examination, and provided a medical opinion supported by adequate rationale. There is no conflicting competent medical opinion of record. For these reasons, and resolving reasonable doubt in favor of the Veteran, the Board finds that the criteria for service connection for insomnia have been met. See 38 U.S.C.A. 
§ 5107(b); 38 C.F.R. § 3.102.

Increased Rating Claims

Disability ratings are determined by evaluating the extent to which a veteran's service-connected disability adversely affects his ability to function under the ordinary conditions of daily life, including employment, by comparing the symptomatology with the criteria set forth in the Schedule for Rating Disabilities (Rating Schedule). 38 U.S.C.A. § 1155; 38 C.F.R. §§ 4.1, 4.2, 4.10. 

When a question arises as to which of two ratings apply under a particular diagnostic code, the higher evaluation is assigned if the disability more closely approximates the criteria for the higher rating. 38 C.F.R. § 4.7. After careful consideration of the evidence, any reasonable doubt remaining is resolved in favor of a veteran. 38 C.F.R. § 4.3.

In evaluating a disability, the Board considers the current examination reports in light of the whole recorded history to ensure that the current rating accurately reflects the severity of the condition. When a claimant is awarded service connection and assigned an initial disability rating, separate disability ratings may be assigned for distinct time periods where the service-connected disability exhibits symptoms that would warrant different ratings. Fenderson v. West, 12 Vet. App. 119, 126 (1999). Such separate disability ratings are known as staged ratings. 

Residual Stroke Disability

The Veteran contends that he has chronic residuals following a CVA that result in increased fatigue, decreased muscular strength, decreased functional capacity, and decreased walking tolerance. Accordingly, the Veteran contends that a higher disability rating is warranted. 

The Veteran's residual stroke disability is currently rated as 10 percent disabling under the hyphenated Diagnostic Code 8009-8521. See 38 C.F.R. § 4.124a. Diagnostic Codes 8007-8009 contemplate embolism, thrombosis, and hemorrhage, respectively, of blood vessels in the brain. In each instance, the vascular injury is to be rated as totally disabling (100 percent) for six months following the initial injury, then rated on the basis of the residual disability or disabilities, with a minimum disability rating of 10 percent. 

The Veteran suffered a CVA on January 18, 2005, more than three months prior to the filing of his service connection claim; therefore, for the entire initial rating period, a disability rating based on the residual disability or disabilities is appropriate. 

Diagnostic Codes 8520-8730 address ratings for paralysis, neuritis, and neuralgia of the peripheral nerves affecting the lower extremities. 38 C.F.R. § 4.124a. Diagnostic Codes 8521, 8621, and 8721 provide ratings for paralysis, neuritis, and neuralgia, respectively, of the external popliteal (common peroneal) nerve. Under Diagnostic Code 8521, a 40 percent disability rating is assigned for complete paralysis of the external popliteal nerve, demonstrated by foot drop and slight droop of the first phalanges of all toes, inability to dorsiflex the foot, lost extension of the proximal phalanges of the toes, lost abduction of the foot, weakened adduction of the foot, and anesthesia covering the entire dorsum of the foot and toes. Lower disability ratings are provided for incomplete paralysis, defined by the Rating Schedule as "a degree of lost or impaired function substantially less than the type picture for complete paralysis given." Id. A 30 percent disability rating is assigned for severe incomplete paralysis. A 20 percent disability rating is assigned for moderate incomplete paralysis. A 10 percent disability rating is assigned for mild incomplete paralysis. 38 C.F.R. § 4.124a, Diagnostic Code 8621. 

Neuritis and neuralgia are to be rated as incomplete paralysis. Neuritis, "characterized by loss of reflexes, muscle atrophy, sensory disturbances, and constant pain, at times excruciating," shall not be rated higher than severe incomplete paralysis. 38 C.F.R. § 4.123. The maximum rating which may be assigned for "neuritis not characterized by organic changes referred to in this section" is moderate, or with sciatic nerve involvement, moderately-severe incomplete paralysis. Id. Neuralgia, "characterized usually by a dull and intermittent pain, of typical distribution so as to identify the nerve," shall not be rated higher than moderate incomplete paralysis. 38 C.F.R. § 4.124. The Rating Schedule further clarifies that "when the [neural] involvement is wholly sensory, the rating should be for mild, or at most, [ ] moderate" incomplete paralysis. 
38 C.F.R. § 4.124a. 

The words "mild," "moderate," and "severe" are not defined in the Rating Schedule. Rather than applying a mechanical formula, the Board must evaluate all of the evidence to the end that its decisions are "equitable and just." 38 C.F.R. 
§ 4.6. The use of such terminology by VA examiners or other physicians, although an element of evidence to be considered by the Board, is not dispositive of an issue. All evidence must be evaluated in arriving at a decision regarding an increased rating. 38 C.F.R. §§ 4.2, 4.6.

Upon VA examination in November 2006, the Veteran reported symptoms of recurrent headaches, vertigo, nosebleeds, tremors, foot drop, and poor vision. Upon physical examination, the VA examiner documented a normal upper extremity neurological examination, but documented slight left foot drop with decrease in extension strength. The VA examiner noted that the Veteran reported decreased visual acuity in the right eye. The VA examiner also noted a positive Romberg test. Following examination, the VA examiner defined the residuals of the CVA as a slight left-sided foot drop with minimal dorsiflexion weakness and vertigo. 

In the March 2007 Notice of Disagreement, the Veteran indicated that he experiences diminished reflexes, foot drop, diabetes, and loss of sensation in his fingers as a result of the January 2005 CVA. The Veteran further indicated that he experiences greater difficulty performing occupational duties as a phlebotomist because of decreased balance and decreased sensation in his fingertips. 

A May 2007 private emergency department treatment record reflects that the Veteran had no sequelae from the January 2005 CVA. 

In a July 2008 statement, the Veteran reported symptoms of left foot drop, diminished reflexes, loss of balance, decreased knee strength, decreased walking tolerance, and decreased carrying ability and capacity. In a second July 2008 statement, the Veteran reported additional symptoms of decreased mental processing speed, decreased depth perception, and increased fatigue. 

Upon VA examination in August 2008, the Veteran reported "the only residual [of his CVA] is very subtle weakness of his left leg." The Veteran denied any dizziness, headaches, and any memory disorder. Upon physical examination, the VA examiner noted no evidence of muscle weakness, muscle atrophy, or impairment of function of the upper or lower extremities. The VA examiner documented sluggish, but equal reflexes bilaterally. In conclusion, the VA examiner opined that the Veteran was experiencing no residual disability following the January 2005 CVA. 

A February 2008 private electrodiagnostic report reflects complaints of left lateral thigh numbness and left foot drop. The physician indicated that the neurophysiological findings were consistent with radiculopathy of the L5 spinal nerve root "superimposed on mild diffuse polyneuropathy, which is most probably secondary to diabetes." The physician further indicated that the left foot drop "could be related to spinal canal stenosis." The report does not mention the January 2005 stroke. 

A September 2008 VA treatment record reflects that the Veteran reported a CVA in 2005 with residual symptoms in his left leg, including left foot weakness and stiffness in his left knee and ankle. Following examination, the VA physician indicated that the left knee symptoms were likely due to degenerative joint disease and the left foot weakness might be attributable to a lumbar spine disorder.

In the November 2008 Substantive Appeal (VA Form 9), the Veteran indicated that he has diminished or absent reflexes in the left lower extremity, pain and weakness in his left foot, and difficulty walking as a result of the CVA. See also January 2013 Statement; February 2014 Statement. 

In March 2009, the Veteran was admitted to a VA hospital for eight days due to a myocardial infarction. These treatment records reflect that the Veteran had a medical history significant for a CVA in January 2005 and variously describe the CVA as: "remote," a "small bleed," "with left sided weakness (minimal to no residual)," and "with residual left foot drop with exertion." These treatment records reflect no specific treatment provided in connection with the residual stroke disability. 

Upon VA examination in April 2009 for a lumbar spine disability, the Veteran reported low back pain with radicular numbness resulting in decreased ability to work, walk, and negotiate stairs. The VA examiner noted bilateral sensory loss in a stocking-type pattern, absent knee and ankle reflexes bilaterally, and diminished vibratory sense. The VA examiner indicated that the neurological findings were compatible with neuropathy "most likely due to diabetes." 

Upon VA examination in March 2010, the Veteran reported left foot drop aggravated by fatigue and left foot numbness; the Veteran denied headaches, dizziness, gait disturbances, fatigability, visual problems, and cognitive problems. Upon physical examination, the VA examiner noted decreased dorsiflexion in the left foot, but noted normal muscle tone, no muscle atrophy, normal lower extremity reflexes, normal gait and balance, no cranial nerve impairment, and no cognitive or psychiatric involvement. The VA examiner opined that the Veteran's residual disability resulted in significant effects on his occupational functioning, noting that the Veteran had lost five weeks of work during the preceding year and the Veteran has been assigned different duties; however, the Veteran remained independent with basic activities of daily living, including bathing, dressing, and grooming. Following a contemporaneous VA examination for hypertension, the same VA examiner described the residual disability as "slight left sided weakness." 

Upon VA examination in November 2011 for a heart disability, the Veteran reported a "mini[-]stroke without residuals" five years ago. Upon physical examination, the VA examiner documented normal cranial nerve and peripheral nerve examinations, including normal lower extremity sensation and reflexes bilaterally; the VA examiner also documented a negative Romberg test. 

Upon VA examination in August 2013, the VA examiner noted the January 2005 CVA resulting in temporary paralysis of the left upper and lower extremity; the Veteran reported current symptoms of tremors in both upper extremities and sleep disturbances, including both insomnia and hypersomnolence. The VA examiner documented no muscle weakness in the upper or lower extremities, normal gait, normal strength, and no muscular atrophy. The VA examiner also indicated that the Veteran's presented with mental health manifestations due to the CVA; however, the VA examiner did not specify the specific mental health symptoms, but only indicated that the severity of the mental health manifestations did not result in gross impairment of thought process or communication. The VA examiner opined that the residual disability did not affect the Veteran's ability to work. 

In a March 2014 statement, A.J., a licensed vocational nurse and co-worker of the Veteran, indicated that she noticed the Veteran experiencing the following signs: bilateral hand tremors affecting the left hand more often than the right, both with movement and at rest; difficulty balancing, particularly in a squatted position; and veering to the left while walking. 

In a March 2014 statement, M.G., a clinical research coordinator and co-worker of the Veteran, indicated that she noticed the Veteran experiencing bilateral hand tremors. M.G. indicated that these tremors make it "very difficult for [the Veteran] to complete certain job duties to the fullest." 

During the March 2014 Board hearing, the Veteran testified that as a result of the CVA he experiences left foot drop particularly with increased activity, decreased tolerance to ambulation, bilateral upper extremity tremors, stuttering, and difficulty concentrating. 

Upon VA examination in July 2014, the Veteran reported left-sided weakness, foot drop after prolonged ambulation, bilateral hand tremors, and insomnia. Upon physical examination, the VA examiner documented normal muscular strength in both upper and lower extremities, normal speech, normal gait, normal reflexes, and no mental health manifestations. The VA examiner indicated that despite the Veteran's report of left foot drop and bilateral hand tremors, neither symptom was found on physical examination indicating that "there is no clinical basis for the subjective reports of the Veteran and may not be obtained by further testing." The VA examiner indicated that the residual disability did not affect the Veteran's ability to work. 

VA treatment records dated between November 2014 and January 2015 reflect symptoms in the left foot, but these symptoms are attributable to new injuries, including a puncture wound to the left foot and an Achilles tendon injury. While these treatment records reflect a medical history significant for a CVA, none attribute any of the Veteran's left foot symptoms to residuals of the CVA. 

The preponderance of the evidence is against a finding of entitlement to an initial disability rating in excess of 10 percent for a residual stroke disability. Regarding the neurologic symptoms in the left foot, the evidence establishes that the Veteran experiences weakness and numbness in the left foot that results in foot drop, particularly with increased activity. Physical examinations across the appeal period have described the severity of this residual symptom as slight (November 2006, March 2010), subtle (August 2008), and minimal (March 2009). Additional examinations during the appeal period have documented no weakness in the left lower extremity. See August 2013 and July 2014 VA Examination Reports. Therefore, the Board finds that the residual neurologic left lower extremity symptoms more nearly approximate mild incomplete paralysis, consistent with a 10 percent disability rating. See 38 C.F.R. § 4.124a, Diagnostic Code 8521. 

Despite the Veteran's descriptions of the severity of his symptoms, the Board must evaluate all of the evidence, both subjective and objective, in deciding the claim, and such descriptions are not dispositive on the issue of severity. See 38 C.F.R. 
§§ 4.2, 4.6. Following an interview with the Veteran and physical examination, VA examiners and clinicians have reported symptoms resulting in decreased dorsiflexion strength and decreased tolerance to prolonged weight bearing activity, but documented no changes in reflexes and no evidence of trophic changes or muscular atrophy. Therefore, the 10 percent disability rating currently assigned under Diagnostic Code 8521 is appropriate, and a higher rating is not warranted. 

The Board has additionally considered other diagnostic codes to provide the Veteran with the most beneficial disability rating for his symptomatology. See Schafrath, 1 Vet App. at 595. However, the preponderance of the evidence is against a finding of any residual disability other than the neurological disability in the left foot (as currently assigned) or insomnia (as adjudicated above). 

Regarding visual impairment, the November 2006 VA examiner noted that the Veteran reported decreased visual acuity in the right eye. However, the Veteran denied visual problems during the March 2010 VA examinations. No other VA examiner has identified visual impairment as a residual symptom of the CVA. Moreover, a July 2014 VA treatment record provides a diagnosis of a refraction error in both eyes, which is considered by VA to be a congenital defect. 

Regarding cognitive function, the August 2013 VA examiner noted a non-specific mental health manifestation following the stroke. However, the Veteran denied cognitive impairment during the August 2008, March 2010, and July 2014 VA examinations, and no other VA examiner has identified any cognitive impairment as a residual symptom of the CVA. 

Regarding balance, the November 2006 VA examiner noted a positive Romberg test. See Dorland's Illustrated Medical Dictionary, pp. 1699, 1715 (defining a positive Romberg test as indicating lost equilibrium and joint position sense). However, the March 2010 VA examiner specifically denied an abnormal balance, and the November 2011 specifically documented a negative Romberg test. Additionally, neither the August 2013 nor the July 2014 VA examiner documented any abnormal balance findings. 

The Veteran is competent to report observable symptoms. Layno v. Brown, 6 Vet. App. 465 (1994). In additional to those reported symptoms discussed above, the Veteran has reported additional symptoms of headaches, vertigo and dizziness, nosebleeds, bilateral hand tremors, diminished or absent reflexes, loss of sensation in his hands, decreased knee strength, decreased upper extremity strength, decreased mental processing speed, decreased concentration, and stuttering. However, to the extent that he has attributed these symptoms to his CVA, the Veteran has not been shown competent to provide such medical evidence. The Veteran testified that during service he first worked as a medic and later managed a medical treatment facility. See Hearing Transcript p. 11. Additional evidence establishes that post-service the Veteran worked as a phlebotomist. There is no evidence, however, that the Veteran has any specialized training in neurology or is otherwise capable of ascribing his symptoms to the CVA as opposed to a different diagnosis. 

In addition, the Veteran's reports of symptoms have varied across the appeal period. In several statements in support of the appeal, the Veteran had attributed various symptoms to his CVA. In contrast, however, the Veteran, in several reports to treating clinicians and VA examiners, did not report the same symptoms that he has reported in his lay statements and hearing testimony. Moreover, in some cases, he denied the presence of such symptoms. For instance, in two July 2008 statements, the Veteran reported symptoms of left foot drop, diminished reflexes, loss of balance, decreased knee strength, decreased walking tolerance, decreased carrying ability and capacity, decreased mental processing speed, decreased depth perception, and increased fatigue. During the August 2008 VA examination, however, the Veteran reported "the only residual [symptom] is very subtle weakness of his left leg." During this examination, the Veteran denied dizziness, headaches, and cognitive impairment and the VA examiner documented no evidence of muscle weakness, atrophy, or impairment in the upper and lower extremities. 

The Veteran submitted two statements from co-workers, both of who indicate that the Veteran experiences symptoms such as bilateral hand tremors, difficulty balancing, and gait disturbances. However, neither statement attributes these symptoms to the Veteran's CVA. Therefore, neither statement provides probative evidence in support of the appeal. 

The competent medical evidence is that provided by the VA examiners and by the Veteran's treating health care providers. The VA examiners and treating clinicians have considered the Veteran's lay testimony together with their objective findings in making findings regarding the Veteran's residual disability. The VA examiners have further provided detailed, specialized determinations relating to the rating criteria. To the extent that these findings are in conflict with the Veteran's lay testimony, the Board finds the medical evidence provided by the VA examiners and treating clinicians to be more probative, and thus, find that this evidence outweighs the Veteran's contentions. See Guerrieri v. Brown, 4 Vet. App. 467 (1993); Cartwright v. Derwinski, 2 Vet. App. 24 (1991); Pond v. West, 12 Vet. App. 341 (1991). 

Given the above, the preponderance of the evidence is against a finding of any other residual disability associated with the Veteran's CVA. Accordingly, entitlement to a separate disability rating is not warranted. 

For these reasons, the Boards finds the preponderance of the evidence is against a finding of entitlement to an initial rating in excess of 10 percent disabling for a residual stroke disability. As the preponderance of the evidence is against the claim for an increased initial disability rating, the benefit of the doubt doctrine is not for application. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102. 

Heart Disability

The Veteran contends that he his heart disability results in increased fatigue, decreased functional capacity, and decreased activity tolerance. Accordingly, the Veteran contends that a higher disability rating is warranted. 

On March 25, 2009, the Veteran experienced a myocardial infarction. From March 25, 2009, to July 1, 2009, the Veteran's heart disability was assigned a temporary total disability rating based on need for convalescence following the myocardial infarction. Effective July 1, 2009, the Veteran's heart disability has been rated as 30 percent disabling under Diagnostic Code 7005. See 38 C.F.R. § 4.104. 

Under Diagnostic Code 7005, a 10 percent disability rating is warranted for a cardiac workload tolerance of greater than seven metabolic equivalents (METs), but not greater than 10 METs, resulting in dyspnea, fatigue, angina, dizziness, or syncope, or; for evidence of a requirement for continuous medication. 38 C.F.R. § 4.104. 

A 30 percent disability rating is warranted for a cardiac workload tolerance of greater than five METs, but not greater than seven METs, resulting in dyspnea, fatigue, angina, dizziness, or syncope, or; for evidence of cardiac hypertrophy or dilation on electrocardiogram, echocardiogram, or X-ray. 38 C.F.R. § 4.104, Diagnostic Code 7005. 

A 60 percent disability rating is warranted for more than one episode of acute congestive heart failure in the past year, or; for a cardiac workload tolerance of greater than three METs, but less than five METs, resulting in dyspnea, fatigue, angina, dizziness, or syncope, or; for left ventricular dysfunction with an ejection fraction between 30 and 50 percent. Id. 

A 100 percent disability rating is warranted for chronic congestive heart failure, or; for a cardiac workload tolerance of three METs or less resulting in dyspnea, fatigue, angina, dizziness, or syncope, or; for left ventricular dysfunction with an ejection fraction of less than 30 percent. Id. 

One MET is defined as the energy cost of standing quietly at rest, and represents an oxygen uptake of 3.5 milliliters per kilogram of body weight per minute. When the level of METs at which dyspnea, fatigue, angina, dizziness, or syncope develops is required for evaluation, and a laboratory determination cannot be done for medical reasons, an estimation by a medical examiner of the level of activity (expressed in METs and supported by specific examples, such as slow stair climbing or shoveling snow) that results in dyspnea, fatigue, angina, dizziness, or syncope may be used. 38 C.F.R. § 4.104, Note (2).

Upon VA examination in March 2010 in connection with hypertension, the VA examiner noted the March 2009 myocardial infarction and resultant residual disability. The VA examiner indicated that continuous medication was required for control of the heart disability. The VA examiner specifically denied the presence of congestive heart failure (CHF) and symptoms of angina, dizziness, syncope, or dyspnea. 

Upon VA examination in December 2010, the VA examiner noted the Veteran's March 2009 myocardial infarction and provided a current diagnosis of ischemic heart disease (IHD); the VA examiner specifically denied the presence of CHF. The VA examiner provided an estimated cardiac functional assessment between seven and 10 METs, indicating that the Veteran's functional capacity was "consistent with activities such as climbing stairs quickly, moderate bicycling, sawing wood, and jogging"; the VA examiner noted that this level of functional capacity resulted in fatigue. The VA examiner also noted contemporaneous testing of left ventricular function documenting a left ventricular ejection fraction (LVEF) of at least 55 percent. The VA examiner indicated the presence of diagnostic evidence documenting cardiac hypertrophy or dilation. Finally, the VA examiner indicated that the Veteran's heart disability did not affect his ability to work. 

Upon VA examination in March 2011, the VA examiner noted the Veteran's March 2009 myocardial infarction and provided a current diagnosis of IHD; the VA examiner specifically denied the presence of CHF. The VA examiner noted a December 2010 cardiac stress test that documented a cardiac functional assessment of 10 METs. The VA examiner also noted a December 2010 left ventricular function test documenting a LVEF of 55 percent. The VA examiner further noted no evidence of cardiac hypertrophy or dilation. Finally, the VA examiner indicated that the Veteran's heart disability did not affect his ability to work.

Upon VA examination in November 2011, the VA examiner provided a diagnosis of IHD; the VA examiner specifically denied any evidence of CHF. The VA examiner indicted that a contemporaneous electrocardiogram showed no evidence of cardiac hypertrophy or dilation.

A December 2011 private cardiology examination report reflects that the Veteran reported chest tightness, but denied angina, palpitations, and syncope. The Veteran reported walking approximately two to four miles per week. The private cardiologist noted diagnostic testing performed in December 2009 documented a LVEF of 55 percent. A contemporaneous treadmill stress test documented a maximum cardiac functional assessment of 8.9 METs; the report indicates that the stress test was stopped due to complaints of chest pain and fatigue. 

Upon VA examination in August 2013, the VA examiner provided a diagnosis of IHD. The VA examiner also provided a diagnosis of CHF; however, the VA examiner indicated that the Veteran did not have chronic CHF or more than one episode of acute CHF. The VA examiner provided an estimated cardiac functional assessment between five and seven METs, indicating that the Veteran's functional capacity was consistent with activities such as golfing, mowing the lawn, and heavy yard work; the VA examiner noted that this level of functional capacity resulted in symptoms of dyspnea and fatigue. The VA examiner further noted contemporaneous diagnostic testing documenting evidence of cardiac hypertrophy and a LVEF of 69 percent. The VA examiner opined that the Veteran's heart disability affected his ability to perform physical, strenuous, and exertional activities due to dyspnea and easy fatigue. 

During the March 2014 Board hearing, the Veteran testified that as a result of his heart disability, he experiences decreased activity tolerance, shortness of breath, and dizziness. The Veteran testified that he experiences symptoms of shortness of breath and dyspnea when walking at a pace approximately three-to-four miles per hour; as a result, the Veteran's representative indicated that this intensity more closely approximated an estimated cardiac functional capacity between three and five METs. The Veteran further testified that he did not recall any instances of CHF. 

Upon VA examination in July 2014, the VA examiner diagnosed coronary artery disease; the VA examiner specifically denied the presence of CHF. Upon an interview-based METs assessment, the VA examiner indicated that "the Veteran denie[d] experiencing symptoms with any level of physical activity." The VA examiner also indicated no evidence of cardiac hypertrophy. Finally, the VA examiner opined that the heart disability does not affect the Veteran's ability to work. 

In the March 2015 Remand, the Board noted that the interview-based results from the July 2014 VA examination were not consistent with the Veteran's testimony during the March 2014 Board hearing. Therefore, the Board requested that the Veteran undergo a cardiac stress test for an actual assessment of cardiac functional capacity. 

Upon VA examination in July 2015, the Veteran completed eight minutes of a treadmill stress test achieving a cardiac functional capacity of 10.10 METs, "which is above average predicted for age." The treadmill test was ended due to complaints of fatigue; the Veteran did not report angina. Additional diagnostic testing documented a LVEF of greater than 55 percent at rest and greater than 70 percent under stress. 

The July 2015 VA examination report does not strictly comply with the March 2015 Remand directives. Specifically, the March 2015 Remand directed that "the examiner must state whether the [heart disability] is manifested by" more than one episode of acute CHF in the past year, a functional capacity less than five METs, or a LVEF less than 50 percent. While the July 2015 VA examination report detailed the cardiac functional capacity in terms of METs and identified an assessment of left ventricular function, the report did not discuss the presence or lack of CHF. However, the same VA examiner completed the July 2014 VA examination report in which he specifically denied the presence of CHF. Therefore, the Board finds that the July 2015 VA examination report, when viewed in the context of all the evidence of record, substantially complies with the March 2015 Board remand, and an addendum opinion is not needed. See Stegall, 11 Vet. App. 268; D'Aries, 22 Vet. App. 97; see also Monzingo v Shinseki, 26 Vet. App. 97 (2012) (holding that "examination reports are adequate when, as a whole, they sufficiently inform the Board of a medical expert's judgment on a medical question and the essential rationale for that opinion" even when the rationale does not explicitly "lay out the examiner's journey from the facts to a conclusion" ) ((citing Acevedo v. Shinseki, 25 Vet. App. 286, 293 (2012) (noting that the law imposes no reasons-or-bases requirement on examiners)). 

The preponderance of the evidence is against a finding of entitlement to an initial disability rating in excess of 30 percent for a heart disability. While some VA examiners have denied the presence of cardiac hypertrophy or dilation, the December 2010 and August 2013 VA examiners noted evidence of cardiac hypertrophy as indicated by diagnostic imaging. Accordingly, the Board finds that the severity of the Veteran's heart disability, in consideration of the entire record, more nearly approximate the criteria for the 30 percent disability rating. See 38 C.F.R. § 4.104, Diagnostic Code 7005.

The preponderance of the evidence is against a finding of entitlement to an initial disability rating in excess of 30 percent. There is no evidence that the Veteran's heart disability is manifested by chronic CHF, multiple episodes of acute CHF, or a LVEF of less than 50 percent at any time during the appeal period. While the August 2013 VA examiner provided a diagnosis of CHF, he denied the presence of chronic CHF or more than one episode of acute CHF. All other VA examiners have specifically denied the presence of CHF, and the Veteran testified during the Board hearing that he did not recall experiencing an episode of CHF. Regarding left ventricular function, assessments throughout the appeal period have uniformly documented a LVEF of at least 55 percent. 

The preponderance of the evidence is also against a finding of a cardiac functional capacity of less than 5 METs. Throughout the appeal period, the Veteran has undergone both interview-based and treadmill cardiac functional capacity assessments; none of these assessments reflect a capacity of less than five METs. The December 2009 private treadmill cardiac stress test documents the lowest measured capacity during the appeal period at 8.9 METs. The August 2013 VA examiner documented the lowest estimated capacity during the appeal period at between five and seven METs. In contrast, treadmill stress tests performed in December 2010 and July 2015 documented a capacity of at least 10 METs, and the December 2010 VA examiner documented an estimated functional capacity between seven and 10 METs. 

The Veteran testified that his actual cardiac functional capacity more closely approximates an estimated capacity between three and five METs. See Hearing Transcript p. 17. The Veteran is competent to report observable symptoms, such as fatigue and dyspnea. Layno v. Brown, 6 Vet. App. 465 (1994). However, the competent medical evidence, which offers specialized determinations relating to the rating criteria, is the most probative evidence with regard to evaluating the pertinent symptoms for the heart disability. The lay testimony has been considered together with the probative medical evidence in clinically evaluating the severity of the Veteran's current symptomatology. In this regard, multiple VA examiners, following an interview with and examination of the Veteran, have provided either an estimated or actual cardiac functional capacity of at least seven METs. 

The evidence demonstrates that the Veteran's heart disability has not been manifested by chronic CHF, more than one episode of acute CHF, a cardiac functional capacity of less than five METs, or a LVEF of less than 50 percent. Accordingly, the preponderance of the evidence is against a finding that the symptomatology associated with the Veteran's heart disability more closely approximates a disability rating in excess of 30 percent for any period on appeal. 

For these reasons, the Boards finds the preponderance of the evidence is against a finding of entitlement to an initial rating in excess of 30 percent disabling for a heart disability. As the preponderance of the evidence is against the claim for an increased initial disability rating, the benefit of the doubt doctrine is not for application. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102. 

Extraschedular Consideration

The Board has considered whether referral for an extraschedular evaluation is warranted. In exceptional cases an extraschedular rating may be provided. 38 C.F.R. § 3.321. The threshold factor for extraschedular consideration is a finding that the evidence before VA presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Therefore, initially, there must be a comparison between the level of severity and symptomatology of the claimant's service-connected disability with the established criteria found in the Rating Schedule for that disability. Thun v. Peake, 22 Vet. App. 111 (2008). 

Under the law, if the criteria reasonably describe the claimant's disability level and symptomatology, then the claimant's disability picture is contemplated by the Rating Schedule, the assigned schedular evaluation is, therefore, adequate, and no referral is required. In the second step of the inquiry, however, if the schedular evaluation does not contemplate the claimant's level of disability and symptomatology, and is found inadequate, the RO or Board must determine whether the claimant's exceptional disability picture exhibits other related factors such as those provided by the regulation as "governing norms." 38 C.F.R. § 3.321(b)(1) (related factors included "marked interference with employment" and "frequent periods of hospitalization"). When the Rating Schedule is inadequate to evaluate a claimant's disability picture and that picture has related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation Service for completion of the third step - a determination of whether, to accord justice, the claimant's disability picture requires the assignment of an extraschedular rating. Id. 

Further, according to Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014), a veteran may be entitled to "consideration [under 38 C.F.R. § 3.321(b)] for referral for an extraschedular evaluation based on multiple disabilities, the combined effect of which is exceptional and not captured by schedular evaluations." Referral for an extraschedular rating under 38 C.F.R. § 3.321(b) is to be considered based upon either a single service-connected disability or upon the "combined effect" of multiple service-connected disabilities when the "collective impact" or "compounding negative effects" of the service-connected disabilities, when such presents disability not adequately captured by the schedular ratings for the service-connected disabilities. In this regard, the Veteran is service-connected for the residual stroke disability, the heart disability, hypertension, left knee arthritis, left shoulder arthritis, a back disability, and, as adjudicated above, insomnia. 

Turning to the first step of the extraschedular analysis, the Board finds that the symptomatology and impairments caused by the Veteran's residual stroke and heart disabilities are specifically contemplated by the schedular rating criteria, and no referral for extraschedular consideration is required. The schedular rating criteria specifically provide for disability ratings for neurologic and cardiac disabilities based on a combination of reported symptoms and clinical findings. In this regard, the Veteran's residual stroke disability is manifested by incomplete paralysis in the left lower extremity, resulting in weakness, numbness, and decreased activity tolerance. The Veteran's heart disability is manifested by cardiac hypertrophy and symptoms of fatigue and dyspnea. The Veteran has reported functional impairments such as difficulty with prolonged activity; however, such impairment is considered as part of the schedular rating criteria. Accordingly, the Board finds that the schedular rating criteria are adequate to rate the symptomatology and functional impairment associated with the disabilities on appeal. In addition, the Board has additionally considered ratings under alternate schedular rating criteria as discussed above. See 38 C.F.R. § 4.20; see also Schafrath, 1 Vet App. at 595. To the extent that the Veteran's residual stroke disability is also manifested by insomnia, the Board has granted service connection for this additional and separate disability. 

The Rating Schedule is intended to compensate for average impairments in earning capacity resulting from service-connected disability in civil occupations. 
38 U.S.C.A. § 1155. "Generally, the degrees of disability specified [in the Rating Schedule] are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability." 38 C.F.R. § 4.1. In this case, the problems reported by the Veteran are specifically contemplated by the criteria discussed above, including the effect on his daily life. Further, the Veteran has not asserted, and the evidence of record has not suggested, any combined effect or collective impact of multiple service-connected disabilities that create such an exceptional circumstance to render the schedular rating criteria inadequate. See Yancy v. McDonald, 27 Vet. App. 484 (2016). As such, and in the absence of exceptional factors associated with the Veteran's residual stroke and heart disabilities, the Board finds that the Rating Schedule is adequate to evaluate the Veteran's current disability profile and symptomatology. Therefore, the Board finds that the criteria for submission for assignment of an extraschedular rating pursuant to 38 C.F.R. § 3.321(b)(1) are not met. Thun, 22 Vet. App. at 115-16; Johnson, 762 F.3d 1362; see also Bagwell v. Brown, 9 Vet. App. 337 (1996); Shipwash v. Brown, 8 Vet. App. 218, 227 (1995).

Moreover, the Board has considered whether the issue of entitlement to a total disability rating based on individual unemployability due to service-connected disabilities (TDIU) was reasonably raised by the record in this case. Rice v. Shinseki, 22 Vet. App. 447 (2009). In this regard, the Veteran reported decreased ability to perform occupational tasks and decreased tolerance to prolonged activity, resulting in increased work absenteeism. In addition, the Veteran reported that his occupational duties were modified to accommodate his symptoms and functional impairments. The Veteran testified during the March 2014 Board hearing that he was currently working full-time, but a January 2015 VA treatment record reflects that he had quit his job. However, there is no indication in the record that the Veteran is rendered unemployable due to his service-connected disabilities and the Veteran has not asserted that he is unemployable. Therefore, as the issue of a TDIU is not reasonably raised by the record, it is not part of the rating appeal. 

ORDER

Service connection for insomnia is granted. 

Entitlement to an initial disability rating in excess of 10 percent for residuals of a CVA is denied. 

Entitlement to an initial disability rating in excess of 30 percent for a heart disability is denied. 
246865166

____________________________________________
VITO A. CLEMENTI 
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs